UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JINDELI JEWELRY, INC.,

                Plaintiff

- against -

UNITED STATES OF AMERICA,

                Defendant.
-----------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 0 4 2016 ★
BROOKLYN OFFICE

OPINION & ORDER

No. 14-cv-0314 (NG)

**GERSHON, United States District Judge:**

The Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. §§ 1202 *et seq.*, prohibits the importation of counterfeit merchandise. In 1996, Congress passed the Anticounterfeiting Consumer Protection Act ("ACPA") which, among other things, amended the Tariff Act to authorize United States Customs and Border Protection ("Customs") to assess civil fines. The ACPA places the imposition of fines "within the discretion" of Customs, *see* 19 U.S.C. § 1526(f)(4), while providing that, for the first seizure of counterfeit merchandise, the fine cannot exceed "the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price," *id.* § 1526(f)(2). Customs's implementing regulations, published at 19 C.F.R. § 133.27, adhere to the statutory language while adding that, in assessing fines, Customs will use the manufacturer's suggested retail price ("MSRP") prevailing "in the United States at the time of seizure."

In 2010, plaintiff Jindeli Jewelry, Inc. ("Jindeli") attempted to import goods bearing a trademark registered by Chanel Inc. ("Chanel"). Customs seized the merchandise and, pursuant to 19 C.F.R. § 133.27, assessed a civil fine of $139,350 (subsequently mitigated to $27,870). In this action, Jindeli does not challenge the seizure or the calculation of the fine. Instead, Jindeli mounts a purely facial challenge to 19 C.F.R. § 133.27, contending that the regulation is arbitrary

and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, on the ground that it restates and does not define the statutory phrase "the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price." Jindeli also contends that, because the regulation is invalid, fines imposed under it are perforce excessive under the Eighth Amendment. On these grounds, Jindeli seeks an order setting aside the regulation, vacating Jindeli's fine, and enjoining Customs from assessing fines under 19 U.S.C. § 1526(f) until new implementing regulations are promulgated.

The government moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted.

## BACKGROUND

### I. The Regulatory Scheme

To evaluate Jindeli's challenge to 19 C.F.R. § 133.27, one must first comprehend the framework in which the regulation is situated. The Tariff Act prohibits the importation of merchandise bearing a registered trademark without the permission of the owner of the trademark:

> [I]t shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise . . . bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States . . . unless written consent of the owner of such trademark is produced.

19 U.S.C. § 1526(a). As is undisputed here, the Tariff Act does not contain an "identity of goods or services requirement," meaning it prohibits importation of merchandise bearing a counterfeit trademark even if the owner of the trademark does not manufacture goods of the same or similar type. *See United States v. Able Time, Inc.*, 545 F.3d 824, 827 (9th Cir. 2008). It is, instead, unlawful to import "*any* merchandise" bearing a counterfeit trademark," 19 U.S.C. § 1526(a)

(emphasis added), and "*[a]ny* such merchandise" is subject to seizure and forfeiture, *id.* § 1526(e) (emphasis added).

With passage of the ACPA in 1996, Congress amended the Tariff Act to include a civil penalty provision. It applies to "[a]ny person who directs, assists financially or otherwise, or aids and abets the importation of merchandise for sale or public distribution that is seized under subsection (e) of this section." *Id.* § 1526(f)(1). At issue in this litigation is a portion of the ACPA prescribing a ceiling for civil penalties. It provides:

> For the first such seizure, the fine shall be not more than the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price, determined under regulations promulgated by the Secretary.

*Id.* § 1526(f)(2). While the ACPA sets a fine maximum, it otherwise grants Customs the discretion to impose fines:

> The imposition of a fine under this subsection shall be within the discretion of the Customs Service, and shall be in addition to any other civil or criminal penalty or other remedy authorized by law.

*Id.* § 1526(f)(4); S. Rep. No. 104–177, at 6 (1995) ("[P]enalties should be meted out at the discretion of the U.S. Customs Service, within the boundaries set out by Congress in the bill.").

To implement § 1526(f), Customs published initial interim regulations, which, after notice and comment, were adopted by final rule dated September 25, 1998. Although the regulations hewed close to the statutory text, they incorporated the concept of "domestic value" while specifying that the relevant MSRP is that applicable "at the time of seizure." The regulations provided:

> For the first seizure of such merchandise, the fine shall not be more than the domestic value of the merchandise (see, § 162.43(a) of this chapter) as if it had been genuine, based on the manufacturer's suggested retail price of the merchandise at the time of seizure.

19 C.F.R. § 133.25 (1998).[1]

On October 13, 1999, Customs adopted further "guidelines for the assessment and mitigation of civil fines by Customs under 19 U.S.C. § 1526(f)." *See* T.D. 99-76 (Oct. 13, 1999), at 1. The guidelines provide that, in issuing fines under C.F.R. § 133.27, Customs will follow 19 C.F.R. § 162.31, a regulation requiring Customs to notify interested parties of both the fine and the "right to apply for relief under" applicable statutes "authorizing mitigation of penalties or remission of forfeiture, in accordance with part 171 of this chapter." 19 C.F.R. § 162.31.[2] As to mitigation, the guidelines themselves set forth a list of "aggravating and mitigating factors," which trigger specified percentage adjustments to the fine below the statutory ceiling. *See* T.D. 97-76, at 5-6.

After issuing fines under this regulatory scheme for several years, Customs concluded in 2002 that the term "domestic value" appearing in 19 C.F.R. § 133.27 had sown confusion.[3] In proposing a revised rule, the agency explained:

---

[1] The regulations were initially published at 19 C.F.R. § 133.25 but subsequently moved to § 133.27. *See* 64 Fed. Reg. 9058 (Feb. 24, 1999).

[2] Pursuant to 19 C.F.R. § 162.31, the notice shall also contain:

> (1) The provisions of law alleged to have been violated; (2) A description of the specific acts or omissions forming the basis of the alleged violations; (3) If the alleged violations involve the entry or attempted entry of merchandise, (i) A description of the merchandise and the circumstances of its entry or attempted entry, and (ii) The identity of each entry, if specific entries are involved; and (4) If the alleged violations involve a loss of revenue, (i) The total loss of revenue and how it was computed, and (ii) The loss of revenue attributable to each entry, if readily susceptible to calculation.

[3] The "domestic value" concept serves specific, unrelated purposes under the Tariff Act. For example, pursuant to 19 U.S.C. § 1606, Customs must "determine the domestic value" of seized merchandise "at the time and place of appraisement." If the merchandise has a domestic value exceeding $500,000, Customs must initiate judicial condemnation proceedings. *See* §§ 1607,

> [T]he term "domestic value" should be removed from § 133.27, leaving "manufacturer's suggested retail price" as the applicable measure of the penalty. The result would be that the formula for setting the maximum civil fine under the regulation would more closely follow the language of the statute. This would clarify for Customs personnel and the importing public the limit of a civil fine and would enhance uniformity in Customs['s] assessment of fines when merchandise bearing a counterfeit mark is imported and seized.

67 Fed. Reg. 39321, 39322 (June 7, 2002). Customs reasoned that these changes also would serve the legislative purposes underlying the ACPA:

> In addition, as the MSRP of a given article (in this case the genuine article that corresponds to imported merchandise bearing a counterfeit mark) is normally greater than its domestic value, because MSRP excludes retail sales and markdowns, civil fines based on the MSRP will normally be greater. Thus, uniform application of the regulation will ensure that the Congressional intent in enacting section 1526(f), i.e., to enhance deterrence of trade in counterfeit goods, is uniformly served.

*Id.*

On July 24, 2003, Customs issued its final rule, which both removed the term "domestic value" and added that the applicable MSRP for fine assessment purposes will be the MSRP in use "in the United States." With these changes, the regulation now reads as follows:

> For the first seizure of merchandise under this section, the fine imposed will not be more than the value the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price in the United States at the time of seizure.

19 C.F.R. § 133.27. This is the regulation here challenged.

---

1610. Otherwise, Customs generally can dispose of the merchandise through administrative forfeiture and auction procedures. *See* §§ 1607-1609. Customs regulations define the term "domestic value" as "the price at which such or similar property is freely offered for sale at the time and place of appraisement, in the same quantity or quantities as seized, and in the ordinary course of trade." 19 C.F.R. § 162.43(a). Generally speaking, this means "the estimated price an importer will charge a wholesale purchaser." *Able Time*, 545 F.3d at 831 n.2.

## II. Jindeli's Fine

On April 8, 2010, Customs detained a portion of a shipment of costume jewelry imported by Jindeli and, after an evaluation, concluded that the jewelry bore a counterfeit interlocking C trademark belonging to Chanel. The counterfeit merchandise consisted of 113 pairs of earrings, 71 rings, 78 bracelets and 113 necklaces. Customs notified Jindeli on July 12, 2010 that the merchandise was to be forfeited to the government. Jindeli has explained that, in light of the "trivial value of the merchandise concerned," it elected not to contest the forfeiture. *See* Compl. Ex. F, at 3.

In calculating Jindeli's fine, Customs officials determined that none of the counterfeit jewelry imported by Jindeli was an "exact duplicate[]" of any piece manufactured by Chanel. *See* Declaration of CBP Import Specialist Derrick Edwards, dated December 19, 2014, at ¶ 29. Customs therefore gathered information from its own databases and elsewhere to determine the "closest authentic Chanel costume jewelry analogues." *Id.* at ¶ 30. Using the MSRPs for those analogues, Customs fined Jindeli $139,350. Customs subsequently mitigated the fine to $27,870 on the condition that Jindeli remit payment within sixty days. Jindeli did not pay that (or any) amount and, instead, brought this lawsuit.

## DISCUSSION

## I. Standard of Review

Under the APA, reviewing courts must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The scope of arbitrary and capricious review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The question is not whether the challenged regulation "is the best one possible or even whether it is better than the alternatives."

6

*F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782, (2016). "Rather, the court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action." *Id.* (internal quotation and bracket marks omitted).

A plaintiff bears a particularly heavy burden when alleging that a regulation is invalid on its face (rather than as-applied to the particular circumstances of the case). To prevail on a facial challenge, the plaintiff "must establish that no set of circumstances exists under which the regulation would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (internal quotation and bracket marks omitted); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012). "It is not enough for [a claimant] to show the challenged regulations could be applied unlawfully." *Ass'n of Private Sector Colls. & Univs.*, 681 F.3d at 442 (internal quotation and bracket marks omitted). In APA parlance, the existence of a "hypothetical case in which the rule might lead to an arbitrary result does not render the rule 'arbitrary and capricious'" on its face. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991).

## II. Jindeli's Claims Can Be Adjudicated On a Motion to Dismiss

Some procedural underbrush needs to be cleared before delving into the merits. "Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). Because legal questions can be resolved on a motion to dismiss, "there is no inherent barrier to reaching the merits [of an APA challenge] at the 12(b)(6) stage." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Jindeli contends that this case needs to be approached differently because the government's motion to dismiss is supported by affidavits and other materials extraneous to the complaint. According to Jindeli, this mandates that the motion be converted to one for summary

judgment, which cannot be adjudicated until Customs produces the entire administrative record. *See* Fed. R. Civ. P. 12(d). I do not agree.

First, the extraneous materials submitted by the government relate solely to the seizure of Jindeli's merchandise and the calculation of Jindeli's fine. As Jindeli emphatically made clear at oral argument, it is not challenging either of these processes. Jindeli's challenge is purely a facial challenge to the validity of 19 C.F.R. § 133.27. Although this opinion refers to certain of the extraneous materials for explanatory purposes, the materials have no bearing on the resolution of Jindeli's claims. Where, as here, a "court simply refers to supplementary materials, but does not rely on them or use them as a basis for its decision, the 12(b)(6) motion is not converted into a motion for summary judgment." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999).

Second, there is no need for Customs to produce the administrative record. Jindeli is correct that, ordinarily, arbitrary and capricious review is predicated on the "whole record," 5 U.S.C. § 706, which consists of those "materials compiled by the agency that were before the agency at the time the [challenged] decision was made." *James Madison Ltd.*, 82 F.3d at 1095 (internal citation and quotation marks omitted). And here, the government does not claim to have submitted the entire record, either as to the seizure and fine or the promulgation of 19 C.F.R. § 133.27. But because Jindeli does not challenge the seizure of its merchandise or the calculation of its fine, there is no need to consult the record on that score. Production of the record underlying the regulation's adoption also is unnecessary because Jindeli does not allege any impropriety in the "rule-making process." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 267 (D.C. Cir. 2001); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 17 n.19

(D.D.C. 2012). As reflected in what follows, Jindeli's claims can be resolved with "nothing more than the statute and its legislative history." *Am. Bankers Ass'n*, 271 F.3d at 266.

### III. Jindeli's APA Claims Fail as a Matter of Law

Jindeli's complaint asserts three counts under the APA, which differ only in the relief they seek.[4] Each count rests on the same contention: that 19 C.F.R. § 133.27 is arbitrary and capricious on its face because it "parrots" the statute without defining the statutory phrase "the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price." *See* 19 U.S.C. § 1526(f)(2). According to Jindeli, "the concept of 'MSRP,'" at least as it appears in the statute, "is not self-defining." Pl.'s Opp'n Br. 16 (Mar. 6, 2015). By merely restating the statutory language concerning MSRP, Jindeli contends, Customs has failed to discharge its obligation under § 1526(f) to adopt implementing regulations and has left the regulated class clueless as to the standards guiding the agency's imposition of fines.

I reject at the threshold the suggestion that Customs has merely "parroted" the statute. While incorporating the statute's phrasing, the challenged regulation makes significant refinements that Jindeli ignores. It specifies in particular that, in calculating fines, Customs is to apply the MSRP in use "in the United States at the time of seizure." 19 C.F.R. § 133.27. These qualifications permit importers to determine which MSRP the agency will utilize in circumstances where the genuine product's MSRP has changed over time or differs across territories. Customs, moreover, has published guidelines (which Jindeli does not challenge) setting forth criteria for the assessment and mitigation of fines below the statutory ceiling. *See* T.D. 99-76. Although these guidelines may not themselves constitute "regulations," *see*

---

[4] The first seeks an injunction prohibiting Customs from issuing fines under 19 U.S.C. § 1526(f) until new implementing regulations are promulgated; the second a declaratory judgment that the fine assessed against Jindeli was *per se* arbitrary and capricious; and the third a declaratory judgment that 19 C.F.R. § 133.27 is unreasonable.

*Nahigian v. Juno-Loudoun, LLC*, 677 F.3d 579, 587 (4th Cir. 2012), they provide that Customs will "[f]ollow the procedures in 19 CFR 162.31," a regulation requiring Customs to notify interested parties of any fine assessed, the fine's legal basis, and any available mitigation rights. The same regulation also incorporates a set of detailed provisions, published at 19 C.F.R. §§ 171.0-171.64, governing the procedures under which mitigation petitions may be presented to, and resolved by, Customs. Not one of these regulatory details is expressed in the statute.

Jindeli is correct that the regulatory scheme does not define "the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price." 19 U.S.C. § 1526(f)(2). But I can discern nothing arbitrary or capricious in this omission. To begin with, the statute does not require Customs to promulgate a regulation defining the phrase. The statute provides that "fines" are to be "determined under regulations." *See* 19 U.S.C. § 1526(f)(2). The phrase at issue simply fixes the ceiling for those fines.

Jindeli contends that definitional regulations are required because the statute is ambiguous. But, while an agency charged with implementing a statute by regulation may be obligated to define ambiguous statutory terms, *see United States Telecom Ass'n v. FCC*, 400 F.3d 29, 38-39 (D.C.C. 2005),[5] there is no ambiguity here to address. By setting the fine ceiling at "the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price," 19 U.S.C. § 1526(f)(2), Congress barred the issuance of fines above the MSRP of the goods being counterfeited. The concept is straightforward. If

---

[5] This obligation has been found "rooted in the prohibition under the APA that an agency not engage in arbitrary and capricious action." *See Pearson v. Shalala*, 164 F.3d 650, 660 (D.C.C. 1999). An agency is not required to "address every conceivable question" arising under a statute, *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995), but the regulated class must at least be able "to perceive the principles which are guiding agency action." *Pearson*, 164 F.3d at 661.

Customs seizes a shipment of counterfeit Nike Air Jordan sneakers, the statute prevents Customs from issuing a fine in excess of the MSRP for genuine Nike Air Jordan sneakers. If counterfeit Chanel jewelry is seized, the fine cannot exceed the MSRP for the genuine Chanel jewelry that the counterfeit jewelry replicates.

Nor is there any ambiguity lurking in the underlying concept of MSRP. It denotes "the price that a manufacturer suggests customers should pay for a product."[6] The concept is used routinely, and without definitional difficulty, in statutes[7] and case law— most notably, in a line of Supreme Court decisions, spanning the bulk of a century, evaluating the antitrust implications of suggested retail prices.[8] True, manufacturers may have different MSRPs for different countries (or currencies), and MSRPs may change over time. But the regulation here addresses the problem of multiple MSRPs by referring customs agents to the MSRP in use "in the United States at the time of seizure." 19 C.F.R. § 133.27.

Jindeli's contention that further elucidation is required rests on a construction of § 1526(f) that is not supported by the text. According to Jindeli, the MSRP referenced in the statute is *not* the MSRP of the genuine merchandise being replicated, but rather a "hypothetical"

---

[6] Cambridge Dictionaries Online, http://dictionary.cambridge.org/dictionary/english/manufacturer-s-recommended-price?q=manufacturer+s+suggested+retail+price (last visited May 4, 2016).

[7] *See, e.g.,* 15 U.S.C. § 1232 (requiring that manufacturer of new automobiles label vehicles with "the retail price of such automobile suggested by the manufacturer"); 42 U.S.C. § 13271 (defining "price differential" as difference between the "manufacturer's suggested retail price" for electric and fueled vehicles).

[8] *See e.g. United States v. Colgate & Co.*, 250 U.S. 300 (1919); *United States v. Parke, Davis & Co.*, 362 U.S. 29 (1960); *Simpson v. Union Oil Co.*, 377 U.S. 13 (1964); *Albrecht v. Herald Co.*, 390 U.S. 145 (1968); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988); *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

MSRP that the counterfeit merchandise might command. *See* Jan. 6, 2016 Hr'g. Tr. at 5; *id.* at 26 ("[T]he statute doesn't say take the value of the MSRP of comparable goods in the market place. It says take the MSRP that the imported product would have if it were genuine.")). To calculate this MSRP, Jindeli contends, Customs must perform a "hypothetical appraisement" by determining the inherent value of the merchandise seized and adding to that sum the value of the intellectual property misappropriated. *Id.* at 5, 27. Jindeli acknowledges that ascribing value to intellectual property is a "complex operation." *Id.* at 27. One way to do it, Jindeli suggests, is to estimate what the trademark holder would charge to license the misappropriated mark. *Id.* at 21. The analysis would be tantamount to calculating trademark damages under a "reasonable royalty" theory. *See Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151-52 (2d Cir. 1996) (noting that reasonable royalty damages "attempt[] to measure . . . what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred").

If the statute called for the hypothetical appraisements Jindeli describes, perhaps further regulations governing the process would be required. But the statute does no such thing. The statute ties the fine ceiling to "*the* manufacturer's suggested retail price"—that is, an MSRP *that exists*. *See* 19 U.S.C. § 1526(f)(2). As Jindeli's "hypotheticals" presuppose, counterfeit goods do not have MSRPs. Genuine goods do. In capping fines at "the MSRP," Congress could have meant only the MSRP of the genuine goods being counterfeited, as the MSRP is just the retail price chosen by the manufacturer. If Congress had wanted Customs to perform "complex" appraisements of counterfeit merchandise, not only would we expect it to have said so,[9] it would

---

[9] As noted in footnote three above, a separate provision of the Tariff Act instructs Customs to "appraise[]" the "domestic value" of seized goods for purposes of determining whether condemnation proceedings are required. *See* 19 U.S.C. § 1606. Congress's inclusion of an appraisement process in § 1606 indicates that its omission in § 1526(f) was intentional. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress

12

have had no reason to reference MSRP at all. I am obligated, however, to give effect "to every clause and word of a statute, and to render none superfluous." *See County of Nassau v. Leavitt*, 524 F.3d 408, 416 (2d Cir. 2008) (internal quotation marks omitted).

Searching for a textual anchor for its argument, Jindeli relies on the phrase "the value that the merchandise would have had if it were genuine." 19 U.S.C. § 1526(f)(2). The phrase may be awkward, but it hardly announces a requirement that Customs perform hypothetical appraisements. It also cannot be construed "in a vacuum." *United States v. Messina*, 806 F.3d 55, 67 (2d Cir. 2015). Statutory language must be read "in context, both the specific context in which [the] language is used, and the broader context of the statute as a whole." *Id.* (internal quotation marks omitted). The phrase Jindeli seizes upon is linked in the statute to the concept of MSRP; that is, "the value that the merchandise would have had if it were genuine" must be set "according to the manufacturer's suggested retail price." 19 U.S.C. § 1526(f)(2). Because MSRPs are not hypothetical, but actual, the former phrase serves only to reinforce that the value to be measured is the value of the genuine merchandise being replicated.

Because Jindeli's reading of § 1526(f)(2) is foreclosed by the text, the inquiry could end there. *See Puello v. Bureau of Citizenship and Immig. Serv.*, 511 F.3d 324, 331 (2d Cir. 2007). Jindeli's reading is nevertheless equally incompatible with the statute's legislative history. Both the House and Senate Committee Reports accompanying the ACPA demonstrate that, in accordance with the enactment's plain meaning, Congress understood § 1526(f)(2) simply to cap fines at the MSRP of the genuine good being replicated. The House Report does not equivocate: "The amounts of the fines are tied to the retail value of the genuine goods." H.R Rep. No. 104-

---

acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.").

556, at 8 (1996). Nor does the Senate Report: "[T]he bill strengthens the hand of businesses harmed by counterfeiters by updating existing statutes and providing stronger civil penalties against counterfeiters, including civil fines *tied to the value of genuine goods*." S. Rep. No. 104-177, at 2 (emphasis added); *see also Disabled in Action v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) (noting that committee reports are among "the most authoritative and reliable materials of legislative history").

Jindeli's reading of the statute also cannot be squared with its purpose. *See King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan."). Congress incorporated civil penalties into the Tariff Act to "provide a deterrent to counterfeiting." S. Rep. No. 104-177, at 11. Increased deterrence was necessary, Congress reasoned, given the "enormous profit potential and low risk of prosecution for criminal counterfeiting." H.R. Rep. No. 104-556, at 3; *accord* S. Rep. No. 104-177, at 5. Congress therefore adopted a purposefully "stringent" penalty regime tied to the MSRP of genuine merchandise. *See* S. Rep. No. 104-177, at 11; *see also* 67 Fed. Reg. 39321, 39322 (noting that MSRP normally exceeds actual retail prices because it "excludes retail sales and markdowns"). Jindeli's "hypothetical appraisement" approach would conflict with this purpose; it would minimize deterrence by driving penalties down. In effect, it would fix the fine ceiling to the importer's costs—that is, the inherent value of the merchandise combined with an estimation of the royalties the importer would have had to pay to license the misappropriated mark. Excluded entirely from this calculation is the "enormous profit potential" that, in Congress's view, incentivizes counterfeiting and needs to be counterbalanced with comparable penalties. *See* H.R. Rep. No. 104-556, at 3; S. Rep. No. 104-177, at 11.

In short, this is not a case where the manifest purpose of a statute compels a departure "from what would otherwise be the most natural reading of the pertinent statutory phrase." *King*, 135 S. Ct. at 2495. Naturally read, 19 U.S.C. § 1526(f)(2) fixes the ceiling for permissible Customs fines at the value of the genuine good being replicated, measured by that good's MSRP.[10] Identifying an MSRP does not entail any hypothetical appraisement of counterfeit goods and, accordingly, Customs regulations governing such a process are not required.

One issue lingers. As this case illustrates, Customs is bound to confront situations where the relevant MSRP for fine calculation purposes will not be self-evident. This problem can arise when the genuine merchandise being counterfeited retails without an MSRP, or where, as here, a counterfeit trademark is placed on merchandise of a type that does not exactly replicate goods manufactured by the trademark owner. There is no dispute that § 1526(f) permits Customs to issue fines in these circumstances. *See Able Time*, 545 F.3d at 827.

In 2003, when Customs proposed removing the term "domestic value" from 19 C.F.R. § 133.27, one "commenter proposed that [Customs] should not issue a penalty notice assessing a fine under 19 U.S.C. § 1526(f) where the manufacturer has not determined a MSRP for its genuine product," and another suggested that Customs use "'domestic resale value' when the MSRP of a genuine good is not available." 68 Fed. Reg. 43635, 43636 (July 24, 2003). Customs responded that "in most cases, there will be a readily available MSRP to use in determining a fine under the statute," but that "[o]ccasional problematic situations will be handled on a case-by-case basis, and reasonable alternatives to using a manufacturer's MSRP,

---

[10] Because I find nothing ambiguous in the statute, I do not address whether Customs has advanced an interpretation to which *Chevron* deference attaches. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) (if the statute is clear, the court "must give effect to the unambiguously expressed intent of Congress").

such as using the MSRP of a comparable good, will be employed with the assistance of [Customs] officers experienced in appraising merchandise." *Id.*

Jindeli does not contend that Customs selected inappropriate comparable goods in this case or challenge the regulation as applied to situations where, as here, Customs must utilize a comparable good's MSRP. Having chosen to pursue only a facial challenge to 19 C.F.R. § 133.227, Jindeli "must establish that no set of circumstances exists under which the regulation would be valid." *Reno*, 507 U.S. at 301 (1993) (internal quotation and bracket marks omitted). Jindeli cannot meet this burden. There is no dispute that the regulation applies to circumstances in which the counterfeit good replicates a genuine good that carries an MSRP. The complaint does not allege any basis to hold the regulation invalid in that scenario, a point Jindeli acknowledged at oral argument. *See* Jan. 6, 2016 Hr'g Tr. at 24 (stating that, where a counterfeit is a "dead knock-off," a regulation could properly fix the fine "to the MSRP of the genuine"). Accordingly, Jindeli's facial challenge must fail.

## IV. Jindeli's Eighth Amendment Claim Is Without Merit

As clarified at oral argument, Jindeli's Eighth Amendment claim does not "direct[ly]" challenge the proportionality of the fine Jindeli was assessed. *See id.* at 4. Rather, the theory of the claim is that, because the regulation is arbitrary and capricious for the reasons Jindeli asserts, there is no regulatory apparatus in place to ensure that Customs fines do not exceed constitutional limits. In this fashion, Jindeli's Eighth Amendment claim rises and falls with its APA claims. Having rejected the APA claims, I find that Jindeli's Eighth Amendment claim fails as well.

Even a freestanding Eighth Amendment claim would be subject to dismissal. The "Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Sanders v. Szubin*, 828 F. Supp. 2d 542, 552

(E.D.N.Y. 2011) (internal quotation marks omitted). It applies to civil penalties, like § 1526(f), that serve at least in part "to punish." *Austin v. United States*, 509 U.S. 602, 610 (1993); *Sakar Inr'l. Inc., v. United States*, 516 F.3d 1340, 1349 (Fed. Cir. 2008) (noting that "Section 1526(f) is punitive in nature"). The constitutional inquiry turns on "the principle of proportionality." *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010) (internal quotation marks omitted). A civil fine violates the Eighth Amendment only "if it is grossly disproportional to the gravity of [the] offense." *Id.* (internal quotation marks omitted).

Jindeli has not plausibly alleged any gross disproportionality in the fine it was assessed. After mitigation, Jindeli was fined $27,870 for importing 375 pieces of jewelry that bore a counterfeit Chanel mark. Jindeli's complaint points to the disparity between its fine and the jewelry's $293 "domestic value"—that is, the price Jindeli would charge a wholesaler. But the wholesale value of Jindeli's counterfeit jewelry, which Jindeli itself has characterized as "trivial," bears no relationship to the gravity of its offense. Counterfeiting is profitable precisely because it illegitimately enhances the retail value of products that are often of lesser quality than their genuine counterparts. *See* S. Rep. No. 104-177, at 4. The resulting harm is suffered by consumers "who pay for brand-name quality and take home only a fake," by genuine manufactures who may be "blamed for the flaws of goods they did not produce," and by "unwitting retailers, who must face the ire of customers who discover that their brand name purchases are in fact counterfeits." *Id.* (internal quotation marks omitted).

It is not my task to fully quantify these harms. At a bare minimum, any quantification would need to include the retail value of comparable genuine products—that is, the sum duped consumers would waste thinking they were getting "brand-name quality." *Id.* (internal quotation marks omitted). In findings unchallenged here, Customs concluded that genuine Chanel costume

jewelry most closely analogous to Jindeli's counterfeits commanded a combined MSRP of $139,350. A fine at that figure would not be grossly disproportionate to Jindeli's offense. The mitigated fine of $27,870 was undoubtedly within constitutional limits.

## CONCLUSION

For the reasons discussed above, Jindeli's complaint is dismissed in its entirety.

SO ORDERED.

/s/ *Nina Gershon*

NINA GERSHON
United States District Judge

Dated: Brooklyn, New York
May 4, 2016